UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN -- SOUTHERN DIVISION


CATHI SCHLOSS,
*Individually and on behalf others similarly situated,*
     Plaintiff,


 -vs-                               Case No.
                                      Hon.
                                      CLASS ACTION COMPLAINT

ONTIME BUSINESS FINANCING, LLC.,
CHRISTOPHER BARBER, and
CRAIG PITTS,
     Defendants.

## **COMPLAINT & JURY DEMAND**

Plaintiff Cathi Schloss brings this class action complaint against Defendants OnTime Business Financial, LLC ("OnTime"), Christopher Barber ("Mr. Barber"), and Craig Pitts ("Mr. Pitts") to stop Defendants' illegal practice of sending unsolicited text message calls to the cellular telephones of consumers and to obtain redress for all persons injured by their conduct.

## **Jurisdiction**

1.    This Court has federal question jurisdiction under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.,* and 28 U.S.C. §§ 1331, 1337.

## Parties

2.  The Plaintiff to this lawsuit is Cathi Schloss ("Ms. Schloss") who resides in Eastpointe, Michigan 48021.

3.  The Defendants to this lawsuit are as follows:

    a.  Ontime Business Financing, LLC ("OnTime") which is a Florida Limited Liability Company doing business in Michigan.   OnTime's principal business mailing address is 4400 N. Federal Hwy, Suite 407, Boca Raton, Florida, 33431.   OnTime's Registered Agent and address is Christopher Barber at 801 SE 14 Street, Deerfield, Florida, 33441. OnTime is the lessor of Short Message Service ("SMS"), otherwise known as text messaging, Short Code 29249 as of August 2, 2016.

    b.  Christopher Barber ("Mr. Barber") is the Chief Executive Officer and the registered agent of OnTime.   The following is the mailing address he provided to the Florida Division of Corporations, 801 SE Street, Deerfield, Florida, 33441.

    c.  Craig Pitts ("Mr. Pitts") is the Chief Operating Officer of OnTime. The following is the mailing address he provided to the Florida Division of Corporations, 4240 Palm Forest Drive North, Delray Beach, Florida,

2

33445.

## Venue

4.  The transactions and occurrences which give rise to this action occurred in Macomb County, Michigan.

5.  Venue is proper in the Eastern District of Michigan as the conduct and events giving rise to Plaintiff's claims arose in substantial part in this District. Furthermore, a substantial amount of the property affected by this claim, the Plaintiff's cellular telephone, is in this District.

6.  Defendants sent multiple unsolicited text messages from SMS Short Code 29249 to Plaintiff in Michigan on her cellular phone with a Michigan area code.

7.  Defendants' messages to Plaintiff were to solicit commercial loan product sales from Plaintiff.

## Auto-Dialed Text Message Calls Violate the TCPA

8.  In 1991, Congress enacted the TCPA, 47 U.S.C. § 227, to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that unrestricted telemarketing . . . can be an intrusive invasion of privacy . . . 47 U.S.C. § 227, Congressional Statement of Findings #5. Specifically, in enacting the TCPA, Congress outlawed telemarketing via

unsolicited automated or pre-recorded telephone calls, finding:

> Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy. Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call . . . is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.
> 47 U.S.C. § 227, Congressional Statement of Findings ## 10 and 12.

9.   Thus, the TCPA prohibits the placement of calls to cell phones using an automated telephone dialing system without the prior express consent of the called party.   47 U.S.C. § 227(b)(1)(A)(iii).

10.   A text message is a "call" within the meaning of the TCPA.   *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009).   Cited by, *Nunes v. Twitter, Inc.*, 194 F Supp 3d 959, 961-62 (ND Cal 2016).

11.   Text messages to cellular devices can be intrusive, costly and are in violation of the TCPA, as noted in the Federal Communications Commission Consumer Bulletin, *Avoiding Spam: Unwanted Email and Text Messages*:

> Many consumers find unwanted texts and email – which can include commercial messages known as spam – annoying and time-consuming. And unwanted texts to mobile phones and other mobile devices can be intrusive and costly.
> (Exhibit 2 – *Avoiding Spam: Unwanted Email and Text Messages.*)

12.   According to the Federal Trade Commission's recent Biennial Report to

Congress, the emergence of new communication technologies has caused the number of illegal telemarketing calls to explode in the last four years.   For example, VOIP technology allows callers to make a higher volume of calls inexpensively from anywhere in the world.   Telemarketers have embraced these advances, causing consumer complaints about illegal telemarketing to skyrocket.

13.   The Federal Communications Commission maintains a consumer guide called *Stop Unwanted Calls and Texts* finding that "unwanted calls, including robocalls and texts, are consistently among the top problems consumers cite when filing complaints with the FCC each year."   (Exhibit 3 – *Stop Unwanted Calls and Texts*).

14.   The Federal Trade Commission also published the following regarding the nuisance of unlawful phone calls and text message calls:

Unwanted phone calls or random text messages seem to come at all hours.   They bug you at work, interrupt your dinner, or wake you up when you're sound asleep.   I think we can all agree they're a real nuisance.
(Exhibit 4 – *Stopping unwanted phone calls and text messages*).

15.   On December 2, 2016, USA Today published a story, finding that these days, "many companies find it cheaper, easier and more profitable to send advertisements by text."   (Exhibit 5 – *Stop unwanted calls and texts from hitting your cellphone*).

16.  Bill Schuette, the Michigan Attorney General, published the following

consumer alert regarding spam text message calls:

> More than one billion text messages are sent everyday in the United
> States and studies show that more and more of these messages are spam,
> or unwanted, unsolicited junk mail, delivered to the consumer's
> wireless phone text message inbox.   Not only is text message spam
> annoying, but it can also slow down your phone by taking up your
> phone's memory and, unlike spam e-mail, lead to unwanted charges on
> your wireless service bill.   Many carriers will charge you simply for
> receiving a text message, regardless of whether you requested it.
> Additionally, if you use a smart phone or personal digital assistant
> (PDA) that functions like a personal computer, spam could put you at
> risk for viruses or "smishing," a scam where consumers are directed via
> text message to a website that unknowingly collects their personal
> information or downloads software that allows the cell phone to be
> controlled by hackers.
> (Exhibit 6 – *Cell Phone Spam Stop Receiving Unwanted Text Messages!*).

17.  The FCC has explicitly included text message calls within the orbit of the

statute, explaining that the TCPA's prohibition on ATDSs "encompasses both

voice calls and text calls to wireless numbers including, for example, short

message service (SMS) calls…"   *Satterfield*, at 569 quoting *In re Rules and*

*Regulations Implementing the Telephone Consumer Protection Act of 1991*,

Report and Order, 18 FCC Rcd, 14014, 14115 (July 3, 2013); reconfirmed *In*

*the Matter of Rules and Regulations Implementing the Controlling the Assault*

*of Non-Solicited Pornography and Marketing Act of 2003, Rules and*

*Regulations Implementing the Telephone Consumer Protection Act of 1991*, 19 FCC Rcd. 15927, 15934 (FCC August 12, 2004).

18.    Telemarketers have increasingly looked to alternative technologies through which to send bulk solicitations cheaply such as Short Message Services (SMS").

19.    An SMS message is a text message call directed to a wireless device through the use of the telephone number assigned to the device.

20.    Plaintiff Cathi Schloss brings this complaint against OnTime and its officers, Mr. Barber and Mr. Pitts, to halt Defendants' practice of making unsolicited text message calls to her cellular telephone, and to obtain redress for all persons injured by their conduct.

21.    By making the text message calls at issue in this complaint, Defendants caused Plaintiff and the members of the class actual harm, including the aggravation and nuisance that necessarily accompanies the receipt of unsolicited text message calls, and in some cases, the monies paid to their wireless carriers for the receipt of such text message calls.

22.    In response to Defendants' unlawful conduct, Plaintiff files this lawsuit and seeks an injunction requiring Defendants to cease all unsolicited text message calling activities and an award of statutory damages to the members of the

class of $500-$1500 per illegal text message call under the TCPA, together

with costs and reasonable attorneys' fees.

### Defendants' Marketing Model Includes Sending Bulk Illegal Text Messages

23.   OnTime markets a number of different financial products to small business,

including, Merchant Cash Advance, Small Business Loans, and Account

Receivable Financing.   (Exhibit 7 – *OnTime Business Financing Home*

*Page*).

24.   Defendants operate the website www.ontimebusinessfinancing.com.

25.   According to the OnTime website, OnTime "was created to help small

business' [*sic*] obtain the financing deserved, in the time frame required."

(Exhibit 8 – *OnTime Business Financing About Us Page*).

26.   OnTime's website goes on to inform consumers:

We provide a comprehensive platform that offers access to working
capital to business' [*sic*] that may have limited access to traditional
financing.   We have helped hundreds of business' [*sic*] nationwide
become the leaders in their industry.
(Exhibit 8 – *OnTime Business Financing About Us Page*)

27.   According to OnTime's profile with the website, www.glassdoor.com,

OnTime's mission is:

Providing access to capital through working capital loans to small business
owners nationwide.   The capital is used to scale business' [*sic*] from $0 to

$100MM + in revenues.
(Exhibit 9 –
https://www.glassdoor.com/Overview/Working-at-OnTime-Business-
Financing-EI_IE1327597.11,36.htm).

28.     One of the methods Defendants use to market OnTime's products is through

        the transmission of text messages to consumer cellular phones.

29.     Christopher Barber is the CEO of OnTime.    (Exhibit 10 – *Barber LinkedIn*

        *Profile*).

30.     According to the OnTime website, Mr. Barber's responsibilities include:

        Keeping OnTime focused on top and bottom line growth, while
        ensuring the company meets its financial obligations.   Chris also
        ensures the company operates in accordance with best practices as
        established by the executive team.
        (Exhibit 8 – *OnTime Business Financing About Us Page*).

31.     As  CEO  of  OnTime,  Christopher  Barber  created,  authorized  and/or

        implemented  OnTime's  marketing  campaigns,  including  its  use  of  text

        message calls to solicit business and commercial loan product sales.

32.     Craig Pitts is Chief Operating Officer of OnTime.    (Exhibit 8 – *OnTime*

        *Business Financing About Us Page*).

33.     According to the OnTime website, Mr. Pitts' responsibilities include:

        Overseeing OnTime's ongoing operations and procedures.   Craig
        helps to establish policies and promotes the company culture and
        vision.
        (Exhibit 8 – *OnTime Business Financing About Us Page*).

34.   As COO of OnTime, Craig Pitts created, authorized and/or implemented OnTime's marketing campaigns, including its use of text message calls to solicit business and commercial loan product sales.

35.   SMS marketing is an advertising tool designed to reach consumers through text messages to cellular phones.

36.   According to usshortcodes.com, "text messages have a 98% open rate success rate that no other marketing tool can match."   (Exhibit 11 – www.usshortcodes.com).

37.   According to Trumpia.com, "SMS Marketing is an advertising channel that allows businesses to advertise, promote, and engage their audience through text messaging."

(Exhibit 12 -- https://trumpia.com/how-sms-marketing-works.php).

38.   Trumpia, a marketing platform, advertises on its website that SMS marketing offers benefits over traditional forms of marketing because:

texts are a personal way of communication, SMS messages have a 98% open rate, and since American consumers never leave home without their cell phones, your text message will be seen within minutes after sending them out.
(Exhibit 12 -- https://trumpia.com/how-sms-marketing-works.php).

39.   Twilio, another marketing platform, advertises on its website that it's service has the capability of sending "100 messages per second."   (Exhibit 13 –

https://www.twilio.com/sms/short-codes).

40.    According to Buildfire.com, there are two ways to secure a short code:

(1) Share a short code provided by your SMS marketing service.    This is by far the most economical option, although it may limit your choice of keywords.    Basically, the marketing service has one short code that is shared by all its clients and you use your keywords to identify campaigns.    You will have to choose keywords not in use by other clients of that service.
(2) Get your own short code used only by your customers.    This gives you much more flexibility in choosing keywords; you own your short code, so you basically own all possible keywords for that code, as well. This option is far more expensive, typically costing $1,000 a month or more to lease from your SMS company.
(Exhibit 14 -- https://buildfire.com/sms-marketing/).

41.    SMS Marketing campaigns are comprised of two elements:

a.    Short Code- A five or six digit number that appears in place of a

traditional phone number; and

b.    Keyword – When employed, a designated word included within the text

message that the consumer is directed to text back to the short code to

participate in a specific campaign.

42.    The essential element of an SMS Marketing campaign is the Short Code

because SMS Marketing messages are sent from short codes, rather than full

telephone numbers.

(Exhibit 15 -- https://www.sendinblue.com/blog/what-is-sms-marketing/).

43. SMS short codes are leased, either to the business itself or to an SMS provider,

such as Tatango.   (Exhibit 16 –

https://www.tatango.com/blog/sms-short-codes-what-every-business-needs-to-know/).

44. Iconectiv is the company that leases out the SMS short codes.   (Exhibit 16

https://www.tatango.com/blog/sms-short-codes-what-every-business-needs-to-know/).

45. According to tatango.com, "Common Short Code" or CSC is also a common

name for SMS short code and:

> The organization within iconectiv that oversees the technical and operational aspects of CSC functions, in addition to maintaining a single database of available, reserved, and registered CSCs is called the Common Short Code Administration (CSCA).   You can find their website here: http://www.usshortcodes.com/.
> (Exhibit 16 –
> https://www.tatango.com/blog/sms-short-codes-what-every-business-needs-to-know/).

46. Usshortcodes.com allows users or potential users to search their directory for

available short codes.

47. According to tatango.com, SMS Short Codes are registered to a directory:

> Want to lookup who owns a short code?   Check out the U.S. Short Code Directory, where not only can you lookup short codes, you can find out how each short code is being used, and even the most appropriate contact information for short code support.   Not only does

the directory provide great information on who and how a short code is being used, it also is a great resource to figure out which short codes are available for sale, when it comes time to purchase a short code, they can help with that too.   You can visit the directory here: www.usshortcodedirectory.com.
(Exhibit 16 –
https://www.tatango.com/blog/sms-short-codes-what-every-business-needs-to-know/).

48.    OnTime is the lessor of SMS Short Code 29249.   (Exhibit 17 --

https://usshortcodedirectory.com/directory/?fwp_short_code_search=29249)

49.    The details section of the usshortcodedirectory regarding SMS Short Code

29249 provides that OnTime activated or that the short code was activated on

OnTime's behalf on August 2, 2016.   (Exhibit 18 –

https://usshortcodedirectory.com/directory/short-code-29249/)

50.    As of the filing of this complaint, SMS Short Code 29249's campaign status

is active.   (Exhibit 18 –

https://usshortcodedirectory.com/directory/short-code-29249/)

## **Text Message Calls to Plaintiff and Putative Class Members**

51.    Plaintiff's cellular phone number has been registered with the National Do

Not Call List since December 11, 2004.

52.    Defendants purchased a list of cell phone numbers, or obtained access to a list

of cell phone numbers through a third-party vendor.

53. Plaintiff believes her cell phone number was included in that list, as well as, numerous other residents of Michigan.

54. Defendants purchased numerous other lists of cell phone numbers that included Michigan residents, many of whom are registered on the National Do Not Call List.

55. Beginning in or around April 2017, although Plaintiff believes it could have been as early as August 2016, Defendants and/or their authorized agents, vendors, or contractors, used an automatic telephone dialing system to make multiple text message calls to the cellular telephone owned by Plaintiff.

56. The body of the message Defendants sent to Plaintiff on June 26, 2017 read:

> There are a number of commercial lending
> products available other than daily
> payment loans to help grow your business!
> Call 888-901-3446 for more information.

57. Of the multiple messages sent from or on behalf of OnTime to Ms. Schloss on her cellular phone, including on the following dates: April 5, 2017, June 26, 2017, July 21, 2017, August 10, 2017, August 29, 2017, September 25, 2017, and October 12, 2017, seven of the messages were the same or substantially the same.

58. All of the text message calls to Plaintiff from OnTime originated from SMS

Short Code 29249.

59. The return phone number included in the body of the text message was (888) 901-3446.

60. Plaintiff's investigation confirmed that phone number (888) 901-3446 is used by OnTime.

61. On information and belief, Defendants made, or had made on their behalf, the same (or substantially the same) text message call to thousands of similarly situated Michigan cell phone users ("putative class members").

62. Defendants made these text message calls to Plaintiff' and putative class members using an automated telephone dialing system ("ATDS"), or contracted with another entity to make the calls using an automatic telephone dialing system.

63. Defendants made, or had made on their behalf, these text message calls to Plaintiff and putative class members, using equipment that had the capacity to store or produce telephone numbers to be called using a random or sequential number generator, and to dial such numbers.

64. On information and belief, Defendants texted thousands of consumers that were on the National Do Not Call Registry.

65. On information and belief, Defendants each were aware that the above

described text message calls were being made either by them directly, or made on their behalf.

66.    These text message calls interrupted Plaintiff's day, both her personal time and her work time.

67.    These text message calls consumed storage space on her cellular phone.

68.    These text message calls caused Plaintiff to stop what she was doing, review the unwanted text message call, and then delete the unwanted text message call or suffer loss of storage on her cellular phone.

69.    These text message calls often littered her text message folder, much to her annoyance and frustration, and caused her to expend extra time to sift through the myriad of unwanted text message calls only to locate the personal text message calls she wanted to address.

70.    The putative class members suffered similar damage.

## CLASS DEFINITION AND CLASS ISSUES

71.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

72.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself and a class (the "Class") defined as follows:

a.   <u>CLASS I</u>

All persons within the United States: (a) to whom Defendants and/or a third party acting on their behalf, made two or more non-emergency telephone calls in a twelve-month period; (b) to their residential or cellular telephone number; (c) using an automatic telephone dialing system or an artificial or prerecorded voice; and (d) when that residential or cellular telephone number had been on the National Do Not Call Registry for more than 30 days (e) at any time in the period that begins four years before the date of filing this Complaint to trial.

b.   <u>CLASS II</u>

All persons within the United States: (a) to whom Defendants and/or a third party acting on their behalf, made one or more non-emergency telephone calls; (b) to their cellular telephone number; (c) using an automatic telephone dialing system or an artificial or prerecorded voice; and (d) at any time in the period that begins four years before the date of filing this Complaint to trial.

73.  **Numerosity:** The message at issue appears in form and substance to be a pre-formatted advertisement targeted to a broad market of individuals who possess cell phones.   While the precise number of Class members is unknown and not available to Plaintiff at this time, these known facts facially support the conclusion that individual joinder is impracticable.   Class members can be identified through Defendants' records and those of cell phone carriers through whom the texts were delivered.   On information and

belief, Defendants have made text message calls to thousands of consumers who fall into the definition of the Class.

74. **Typicality:** Plaintiff's claims are typical of the claims of other members of the Class, in that Plaintiff and the Class members sustained damages arising out of Defendants' uniform wrongful conduct and unsolicited text message calls.

75. **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in class action litigation.   Plaintiff has no interest antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.

76. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members of the Class.   Common questions for the Class include, but are not necessarily limited to the following:

a.     Whether Defendants' conduct constitutes a violation of the TCPA;

b.     Whether the equipment Defendants used to make the text message calls in question was an automatic dialing system as contemplated by the TCPA;

c. Whether Defendants systematically made text message calls to persons who did not previously provide Defendants with their prior express consent to receive such text message calls;

d. Whether Class members are entitled to treble damages based on the willfulness of Defendants' conduct.

77. **Superiority:** This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all parties is impracticable. The damages suffered by the individual members of the Class will likely be relatively small, especially in comparison to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and

comprehensive supervision by a single court.    Economies of time, effort, and expense will be fostered, and uniformity of decisions ensured.

### COUNT I:    Violation of the TCPA, 47 U.S.C. § 227 *et seq.*, (On behalf of Plaintiff and the Class)

78.   Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

79.   Defendants and their agents made unsolicited text message calls to cellular telephone numbers belonging to Plaintiff and the other members of the Class *en masse* without their prior express consent.

80.   Defendants made the text message calls, or had them made on their behalf, using equipment that had the capacity to store or produce telephone numbers to be called using a random or sequential number generator, and to dial such numbers.

81.   Defendants and their agents utilized equipment that made, or had made on their behalf, the text message calls to Plaintiff and other members of the Class simultaneously and without human intervention.

82.   By making, or having made on their behalf, the unsolicited text message calls to Plaintiff and the Class, Defendants have violated 47 U.S.C. § 227(b)(1)(A)(iii) and 47 U.S.C. §227(c)(5). As a result of Defendants'

unlawful conduct, Plaintiff and the members of the Class suffered actual damages in the form of money they paid to receive the unsolicited text message calls on their cellular phones and are entitled to statutory damages under section 227(b)(3)(B) and 227(c)(5) at a minimum of $500.00 in damages for each such violation of the TCPA.

83. Should the Court determine that Defendants' conduct was willful and knowing, the Court may, pursuant to section 227(b)(3)(C), treble the amount of statutory damages recoverable by Plaintiff and the other members of the Class.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

## PRAYER FOR RELIEF

84. WHEREFORE, Plaintiff Cathi Schloss, individually and on behalf of the Class, prays for the following relief:

85. An order certifying the Class as defined above, appointing Plaintiff Cathi Schloss as the representative of the Class, and appointing her counsel as Class Counsel;

86. An award of actual and statutory damages;

87. An injunction requiring Defendants to cease all unsolicited text message calls,

and otherwise protecting the interests of the Class;

88.   An award of reasonable attorneys' fees and costs; and

89.   Such other and further relief that the Court deems reasonable and just.

Respectfully Submitted,

By: s/ Sylvia S. Bolos
Sylvia S. Bolos (P78715)
Ian B. Lyngklip (P47173)
Julie A. Petrik (P47131)
LYNGKLIP & ASSOCIATES
CONSUMER LAW CENTER, PLC
24500 Northwestern Hwy, Ste 206
Southfield MI 48075
(248) 208-8864
SylviaB@MichiganConsumerlaw.com
Ian@MichiganConsumerLaw.com
Julie@MichiganConsumerLaw.com

Anthony Paronich
BRODERICK & PARONICH, P.C.
99 High Street
Suite 304
Boston, MA 02110
(508) 221-1510
Anthony@broderick-law.com

*Attorneys for Plaintiff*

Dated: December 7, 2017